Good morning, Your Honor. My name is Ben Glass. I'm here on behalf of Timothy. He goes by Keith Mullins. I'd like to reserve three minutes of our time for rebuttal. ERISA gives plan administrators huge power over the financial future of long-term disability claimants. With that power comes a lot of responsibility, a huge responsibility, and the responsibility is to act like a fiduciary. So let's dive into this. You'd agree, wouldn't you, that there's an enormous amount of discretion vested in the ERISA fiduciary, right? I agree. And that we can only overturn that decision if it's arbitrary and capricious. Yes, sir. Right, which we have equated to abuse of discretion and essentially irrationality. Yes, sir. Okay. Then explain why it would be irrational, even if you thought, even if we thought that, you know, it's wrong to look at Drs. Patel and Dr., I hope I'm saying these gentlemen's names right, and Cohan's evaluations of your client, that that's not the best way to have done it, but these are two pain specialists and they looked at this and they examined the record and they thought, yeah, no, he still hurt. He's still got limits, but he can do stuff. What makes that an irrational or unfounded decision? Yes, sir. So what this court has said is we look at either structural irregularities, there are none in this case, and procedural irregularities. And the biggest, and I've got seven procedural irregularities in our brief to talk about. I'll talk about maybe the top two or three as time allows. The biggest problem in this case is that the plan decided that Keith Mullins met the definition of disability for four and a half years and the last three of those years were in the any occupation period. So then when the plan says to paper reviewers, give us your opinion, and the paper reviewers make hair-splitting judgments about the ability to sit, stand, lift, without ever having laid eyes on this claimant. And with nobody, Judge Stewart, and no one ever saying, hey, we, the plan, have determined that he meets the definition of disability for three years. So the question to ask the paper reviewers is what has changed, number one, and how do you know? Well, there you go. You've hit on something significant. Can you, if I'm not mistaken, didn't the Supreme Court say in Black and Deckard that administrators do not have the discrete burden of explanation when they credit reliable evidence? They don't, it sounds like the argument you're making is they needed to explain more in order for this to be rational, but the Supreme Court seems to have said they don't have to explain more. If the evidentiary foundation is a credible one, like two doctors skilled in the field, they don't have to give you any more explanation than relying on those people. What do we make of Black and Deckard? I think that what we have to look at is the evidentiary foundation, right, because you have conclusions by these physicians. And remember, a fiduciary is supposed to be curious. A fiduciary is supposed to be neutral. And a fiduciary should be saying, okay, I hear what you say. You differ from the treating physician about how much he can lift, how much he can walk, how much he can stand. Show me, because I'm a curious fiduciary, show me in this record, in the actual medical records, what has changed. So your argument is they owed you more explanation. But that's what it sounds like you're saying. I might be misunderstanding you, but it certainly sounds like you're saying they should have done a better job of explaining this. And that's why I'm asking about Black and Deckard, because it seems like Black and Deckard is saying they don't have to do a perfect job of explaining this. That's not the basis on which you, lower court, should be deciding these cases. So I will agree with you that they don't have to do a perfect job of explaining this. They do no job of explaining this. There is simply a conclusion reached about things like sitting, lifting, capacity for work, capacity in light of this gentleman's pain, with zero explanation. And I don't think Black and Deckard, see, if the only thing in the world was that we get a paper review, we get a report, and that's good enough, then these cases are never litigated. There's nothing for a reviewing court to look at and to think about and to start to say to itself, what's the fiduciary, the plan, acting as a neutral here? And my point is, my biggest point is, someone should have said, because when you look at Dr. Patel, who was the first reviewer, he says, this gentleman had sedentary capacity all the way back to the last day that he worked. And somebody at the plan should have said, you know, this is what this court has said in Miller v. American Airlines, and then more recently in a case called Noga, I think, Noga or Noda. This court has said, you know, when the plan has made a decision, and in this case, stuck with that decision for three years, the curious fiduciary at least has to ask itself and ask its reviewers what has changed. The curious fiduciary has to say, in my view, Judge Jordan, show me what the underlying basis is for this. And it could be. Yes, sir. Didn't Mr. Mullins' treating doctor, the orthopedic surgeon McGarry, say that he could do work with, you know, lifting and walking restrictions? Similar to Patel. There's some differences, but similar. I don't think that he did, but even if he did, even if there's that in the record, Judge Porter, for three years the plan accepted the medical records that were given to it as meeting the definition of disability for this plan. And what I'm saying is what this court has said is that when a plan has made a decision, and in Miller it was a shorter time, in Noga it was a really short time where the plan is saying, hey, we're going to put this gentleman back on claim, but the next day we're going to go get an IME review. This court said that's a procedural irregularity that at least should make us think that this is not an unbiased fiduciary. And, you know, yes, sir. Are you making the argument that this is a biased fiduciary, and because it's a biased, you're not making the sliding scale argument to us again. Of course not. No, sir. That's gone. That's out the window. That's gone. Okay. Well, go ahead. I'm sorry. I interrupted you. Finish your answer. Well, I'm trying to think of where I was with that. Oh, you asked me about the treating physician. I said I don't think that's in the record, but even if it was, the plan accepted it as such. And what I'm saying is a curious fiduciary, what this court has said, what this court has said, we look at how they treated the claimant. And so it's not just one thing. It's not just the fact that he was on claim for three years. That would make us, I suggest to you, you all, suspicious of the arbitrariness of this decision. Well, your argument really is hinging on the idea that nothing changed, but they said something had changed. But their argument is something did change. We thought he got better. And the only reason we gave him an extension was because there was new evidence about mental illness. And the last extension we gave him was purely about mental illness. If I understood your argument correctly, your pushback on that is, oh, no, it wasn't just about mental illness. But what is there in the record that would tell us that that's not so? Yes, sir. Especially given, you know, they've got this March 2019 letter where they say that, or they at least seem to indicate if mental illness is the primary cause or contributing cause to your disability, the company is going to pay you for up to 12 months if your condition no longer fits the criteria of mental nervous limitation, but remains disabling. It will be evaluated after that. I mean, they say these things also that if he continued to be disabled due to a non-mental diagnosis, he should submit additional information. Those things out of this March 2019 letter all seem to indicate that it was focused on mental illness. What do you have that says, oh, no, no, no, that's not so? I understand the question. So first of all, so now if we were to take that as a demarcation line, that's two years that they've paid him for physical, number one. Number two, that was not just about mental illness. We get that from two places. One, that letter, if that was a denial of benefits for physical, needed to be a lot more clear. Remember, ERISA requires the plan administrator to be very clear in saying why we're denying and what you can do to remedy that. It's not enough to be implicit when you say, okay, we're doing this for your mental illness. Then you have to go on and say, and we're not doing it for non-mental illness. Yes, sir, that's my position. That's your legal position. Number one. And then number two, if you go and look at the claim notes that are surrounding this, two or three or four claim notes that surround the issuance of that letter, basically what the claim notes said was that, hey, we got this Social Security file, there's a psychiatric report in it, and we haven't done the mental illness thing yet, so now let's put the mental illness thing in. And the claim notes don't say either, the letter doesn't say or the claim notes don't say, but he doesn't have physical disability anymore. In any event, even if you were to disagree with me on that, that's still two years into with no change in medical condition. Now, look. Yes, sir. I had a couple more questions. First, turning to the Social Security offset, why should we view that as other than a forfeited issue since it wasn't administratively exhausted? Because ERISA requires claimants to go through the process of appealing, internally appealing their claim decision. It does not require claimants, particularly a gentleman like 10th grade graduate Mr. Mullins, to exhaust every legal issue that he has. You didn't have to exhaust that. You didn't have to raise that and talk to them about it. Exactly. Okay. That's 100%. Here's my last question. Sue, for the sake of discussion, we thought that you were right. In particular, you were right about their using a conceded and obviously wrong and concededly wrong vocational evaluation because it was based on a false statement of what his previous position had been. Yes, sir. And we thought, you know, garbage in, garbage out. You can't possibly say this is suitable employment when you're completely wrong about what previous employment was. Just take it for granted. And I'm going to ask them this. Yes, sir. Sure. We thought that was right. What would be the appropriate remedy? Is the remedy that we say, well, the decision was irrational, so you have to reinstate his benefits, and then you can go ahead and reevaluate based on correct terms? Is it that we just say, well, you get a do-over, you don't get reinstated benefits, but they have a chance to correct their error? Is there some other thing that you would get, even if we thought you were right? What's the answer? What's the remedy look like? Miller vs. American Airlines says that it's an unlawful termination of benefits and you say that was unlawful. We reverse that. You bring him back to status quo. You order the payment of back benefits. Thank you. That's a good way to put it. Is status quo he doesn't have benefits because it was denied, or is it he gets benefits and back benefits, and then they have to take steps from there? I think there's two things here. Number one is what the court does with the issue of whether he's disabled or not. Because if the court finds that he was... We can't find. That's my point. I'm sorry. We're not going to find anything. We're a reviewing court. We're not a fact-finding court. That's why I'm trying to get you to give your position here, and I am going to ask for their position here. What would be returning this to the status quo look like? Would it be saying your decision was irrational, ergo it can't stand, and therefore you are entitled to those benefits and back benefits until you change? Or is the status quo your decision was irrational, it can't stand? That says nothing about past benefits. Go ahead and figure this out and do it the right way. What's it look like? What does status quo ante look like when we send this back? If we thought it is an arbitrary decision. Yes, sir. So my view is this court has said that in the Miller v. American Airlines case, the pilot case, where the court said the decision was irrational and arbitrary. So we return the claim of the pilot in that case to the status quo, which is on claim, paid benefits to date. Certainly from now until age 65 or 66, whatever the plan is, they have a right to go and continue to look at his condition. Yes, sir. Instead of assuming that the 2019 report is a problem, can you explain to us why it is a problem? When it incorporated the 2016 report that got the job title right. Sure. And both reports accurately described his skills and experience. Yes, thank you for that question. So number one. It seems to me like it's kind of a gotcha argument. Oh, they got the wrong title. But in general, both reports get it right except for that mistake. Well, no, they don't because it's not a gotcha argument with due respect because in one they made him the superintendent of the mines and this guy had never worked in an internal building in his life. No, I get that. That was a mistake. Yes, sir. But the reason I'm saying it sounds to me like a gotcha argument is because the same report, the 19 report that made that mistake, incorporated the 16 report that got the title right and both reports accurately described his skills and experience. What? So I disagree with you on that very last part of your statement. Okay. That they accurately described, number one. Number two, to the extent, and I also disagree that it incorporated the later report incorporated the 2016 report, couldn't have because if anyone had looked at it, it would have seemed that they were black and white. But let me say this. As a matter of ERISA law, he would, if the Court says, well, you know, that 2016 report was good enough, he never got the chance to address that. And in all of these vocational reports, you know what they do is they go, here's three job titles. They don't give you any, again, no analysis, no nothing. And what lawyers do, lawyers go in and look and start to compare personal capabilities with things like the Dictionary of Occupational Titles requirements. And that's what we do. So he would, at the very least, have an opportunity to go back and say, all right, you want to talk about the 2016 report, Mr. Plan Administrator, let us address it, which we never had the opportunity to do. The 2016 report was rejected anyway because they paid his benefits. And so he would have had no reason in 2016 or 2017 to even address that issue. When the final denial comes out, they don't explain we've elevated you to a mine superintendent in order to do this. So, again, plans speak through their denial letters. Go ahead. Okay.  Thank you. We'll have you back on rebuttal. Yes, sir. And we'll hear now from counsel for Consol Energy. May it please the court, my name is William Lewis, and I'm appearing on behalf of the Pali Consul Long-Term Disability Energy Plan. How do you – your client's name is not abbreviated for consolidated, so you pronounce it consul or consul? How do you pronounce it? Your client pronounces it. I just say consul, consul energy. Okay. Okay. Well, why don't we start sort of where we were leaving off with Mr. Glass. Even if we assume that everything else you did was great, your clients once removed Lincoln's administration of this plan was going swell, if in the last analysis their decision to deny is based on, and it has to be based on, the notion that there's suitable employment for you that you could be doing, and yet that suitable employment analysis is based on a manifestly erroneous statement of what his past experience is. How can the decision stand? Your Honor, the decision can stand here because of the – notwithstanding the mistake that was made in the 2019 vocational analysis or the transferable skills analysis report, misidentifying his former position with the company as a mine superintendent, it can still stand because this is an abusive discretion review and that a reasonable mind, a reasonable person could look at the 2019 report and be able to understand that this is still making an accurate assessment of his ability to engage in suitable employment. Well, yeah, that's exactly the breakdown I'm asking you to look at. And so instead of asserting that, why don't you explain to us why a reasonable mind should look at the 2019 letter, and maybe we should take a step back. You'd agree, wouldn't you, that in order to make a denial, you have to be able to identify suitable employment, right? Correct, Your Honor. Okay, and suitable employment is defined to be based on your education and experience. Those are the things that you have to take into account, right? Correct, Your Honor. Okay, and here the assertion about what his previous education and experience was was just wrong, was just flat-out wrong, correct? I would disagree, Your Honor. You think he was a mine supervisor. Well, that's—so in terms of his skills, I would make the argument, our position is that his experience and his skills were correctly identified here. His experience and skills? Are you saying that the position you guys have, excuse me, folks at consul have, are that mine supervisor and foreman in the mine are the same, so that you can say your experience and skills in those two jobs are functionally the same? Because that's what I just heard you say. Did I mishear you? We're not taking the position that the mine superintendent and section supervisor are the same position here. Both reports identified the position that he held at the company. One misidentified in 2019. However, they went on to explain and identify the kind of skills that this individual, that the appellant has, and identified management skills, communication skills, computer skills, which were as broad as can be. And does mine supervisor, does the supervisor foreman position say anything about computer skills? That would be—I find that a little surprising. But more importantly, aren't these—isn't this like a computer-generated thing? Like you feed in what the job description is, and it tells you, based on that, what the skills you'd anticipate that person would have. This analysis, these vocational—these transferable skills analyses, is not simply just a computer-generated report. So it also involved a discussion with the actual appellant, so that the person conducting the analysis took into consideration more information. They may have done, but certainly you'd have to admit that a major driver of this decision is what the person's previous job was. You look at what the DOT job description is, right? And you put that information in, and there's this— If there's a logical line that you have to draw to justify your decision, I'm just having real difficulty with the notion that you can call somebody the superintendent of the entire operation and say that the skills that you would acquire in that circumstance are going to produce suitable employment for you, and then say, you know what? That was wrong. You were really a foreman in the mine, but never mind, because everything else we said was right. That just—why does that error, that conceded error, not swamp everything else? Because it feeds through all the other stuff you have to say about suitable employment. So for two reasons, Your Honor. Number one, the issue here is not whether they correctly identified his position with the company, but it's really the issue here is, is he capable of performing a job that is consistent with the functional limitations identified by the peer-reviewed positions? That's true. That he could perform. That's the question they should have answered, right? To answer that question, does he have the skills to have suitable employment, and what would that be? To have a rational, that is not an arbitrary or capricious, but a rational decision on that, doesn't a major input have to be correct? Can you have a major input in that analytical process be completely wrong, and then at the end say, never mind? Forget you got the Emily Letelier defense from Saturday Night Live. Never mind, because he still had some skills. I don't think—I don't even hear them arguing that he doesn't have skills. He's got skills. The question is, did you guys arbitrarily and capriciously, that is, irrationally, peg what his skills were and what his suitable employment would be? Because if you irrationally did that, why don't you have to go back and do it again? We would do that if this was a decision-making by a district court, wouldn't we? Your Honor, they don't need to go back and do it again, and the reason why is twofold. So the 2019 report, the person, the analyst who created that report referenced the 2016 report specifically, so it's taking more information into account. The 2016 transferable skills analysis correctly identified his position with the company, correctly took into account the determination by the peer review positions that he was incapable or capable of sedentary work. I don't hear them arguing with that either. The response from Mr. Glass is, that's true, but so what? The decision wasn't made on the basis of the 2016. The decision was made on the basis of the 2019 evaluation, and the fact that you got it right once doesn't fix the error in the decision you made in 2019, and indeed, to say that you could do that would fly in the face of the responsibility you have under ERISA to be clear with the beneficiary, because what you're really saying is, even though we didn't talk about 2016, even though we were talking based on 2019, you should have understood, you should have got it, that what we really meant was the 2016 stuff. How does that work? Well, so it is, at issue here is, was their decision to terminate his benefits based on substantial evidence, and the 2016 report is substantial evidence that was part of the claims file that the, that was specifically considered and referenced in the 2019 report, and if he was capable, if the positions identified in the 2016 report are based upon substantial evidence, they're reasoned and they're appropriate. But the 2016 benefits determination was reversed on appeal. He got benefits. So how can you say there's a finding that he is able to do the jobs listed in the 2016 report? So the 2016 report, what, the job position, right, his experience as a, his vocational experience, his skills and his qualifications, they didn't change between 2016 and 2019. That remained the same. Insofar that there is a reversal of the 2000 benefits determination, that did not have to do with any kind of change in his vocational experience or history or qualifications. That was focused on the fact that his medical rec documentation, that there was a change in his prognosis history. So what happened in 2016 is a peer review report was engaged at that time. The peer review physician, Dr. Green, in 2016 concluded he was capable of performing sedentary work, which is the same conclusion that the subsequent peer review analysis also reached. The reason why that this was, this benefits denial was reversed on appeal is because he brought it to the attention of the claims administrator that he had an ankle surgery scheduled, and so they deemed it appropriate to reinstate benefits until, and then revisit his eligibility determination for benefits after the ankle surgery. Okay, so there's an ankle issue. Sure. Then we get to 2019, 2020. We have reports by your reviewing physicians who either ignore or slight the persistent ankle issues. So that, that's a procedural problem with it. You know, you're asking us to say, well, there's substantial evidence in the record. And if, if there hadn't been these multiple procedural errors of the wrong job title and the failure to mention or discuss the ankle and some other things, you know, substantively would there be enough evidence? Possibly. But we can't just defer when, you know, there appear to be major procedural problems with the way this evidence was, was addressed, considered, misunderstood, mislabeled. Your Honor, I disagree that there are major procedural errors here. You know, we, we addressed the, the, the, the misidentification. Having, making a guy who's working in the mine, the mine superintendent, and making that the basis of decision for what his suitable employment is, that's, you don't, you don't think that's a major problem? No, Your Honor. Like you could put anything in there? Is it the basis of the decision, that, that mistake? Was it the basis of the decision? No, Your Honor, no, it was not the basis of their decision in, in concluding that he was capable of performing the, the job, that he was capable of performing vocations with, with his functional limitations that the peer review positions. These jobs require an ability to lift 10 pounds. But the earlier documentation suggests he can only lift 5 pounds. There's a gap. So the, the documentation on, on what his lifting capabilities are is, is not as clear as the appellant would, would try to make out. So he, we have a treating physician, Dr. McGarry, who in a few of his treatment notes stated that he's to avoid lifting over 5 pounds until instructed otherwise. That reappears a few times in some of the treatment notes and then disappears. Another, his orthopedic surgeon who actually performs ankle surgery on the appellant, twice, including his treatment notes, this individual was capable of lifting up to 10 pounds regularly and up to 25 pounds occasionally. And so even his treating physicians are not uniform in their assessment of what his lifting capabilities were. So it's not without reason or irrational for four different peer review positions over the course of this claims determination to look at this and then conclude that this individual was capable of performing sedentary work. It looks to me like you're reasoning backwards from a denial benefit to the, to the reasons for it. And the thing that maybe is small but troubling that's in there is, you point to a bunch of social media posts and I don't see any evidence, it's not like he's lifting weights or, you know, hauling timber or anything like this in this. The fact that he's outdoors, you're treating as enough reason to deny. Like, what evidence is there in here, unless it's that he happened to be wearing a MAGA cap in one of them. Is this just bias against him? Your Honor, respectfully, no. The social media posts were referred to by, in the administrative record only, in the final benefits denial letter. So he had already been given. Social media posts actually properly and lawfully be part of this? I mean, weren't they things that had nothing to do with what the medical reviewers were talking about? Did any of the medical reviewers talk at all about the social media posts? No, they were not addressed by the medical reviewers, Your Honor. And you're not suggesting that other people, that you based your decision, or maybe you are. Maybe that's another problem with your decision, that you really didn't, like it was, you know what, we've got these medical decisions, but we think we're expert enough to look at your social media posts and see you outside and determine you're not actually disabled. If he'd been in a lifting competition, I would get it, that you don't have to go back to the, but there's nothing here that remotely looks like he's doing strenuous activity, is there? Your Honor, you know, at the end of the day, really what we're looking at is, did they abuse their discretion? Was it completely irrational for them to reach the conclusion that this individual was no longer totally disabled? And do we, in making our judgment about that, do we have to look at your post hoc rationalizations and say that's good enough? Or do we look at what you, you know what I mean, right? I'm talking about Lincoln, that we look at what they said and pay attention to what they expressed and ask whether that is rational. Are we allowed to look beyond what their expression is of what they decided and judge rationality on that basis? Maybe I've asked that badly. Do you know what I'm trying to ask? I think I do, Your Honor. Okay. So, look, what's relevant, what's most relevant here is what's been stated by the claims administrator as its reasons for denying benefits. But the entire administrative record can also be reviewed to help to discern or help the court understand whether it is without reason or basis. Whether there's a basis for what they've decided. For what they've decided. But we have to look at what they said, right? I mean, that's what we're required to do. What did they say? And then pay attention to whether there's substantial evidence supporting how they expressed their own decision, right? That is correct. And the courts in the Third Circuit are very clear that it is rational and reasonable for claims administrators to engage peer-reviewed physicians who have complete access to the complete complement of the medical record and then make a determination. There's no requirement for them to give deference. I don't think you have to make that pitch because that's true and we accept that. Although, I would ask you this. Should we be suspicious of peer-reviewed doctors who render an opinion on the same day that they purportedly are requiring information from others? I mean, didn't Dr. Patel write to other physicians and say, hey, tell me about your treatment of this person? And yet he issued his opinion obviously before he got anything back because he issued his opinion the day he wrote to these people, right? It kind of looks like he's papering the record when he's got no intention of paying any attention to what anybody says to him because he's already rendered his opinion. Doesn't that kind of undermine the assertion that these are just neutral doctors out there trying to do the right thing and instead these are doctors who are trying to paper the record for the benefit of the ERISA administrator to not make a payment? So, Your Honor, Dr. Patel, in his notes, called and left messages and then wrote these letters to the treating physicians. He didn't wait to get an answer. So, he issued his report. In his letter, he requested them to respond within five days. Now, he did provide his report to the claims administrator before those five days were up. That's irrelevant. The question is what's the quality of his report? If he knows I should get this information and he papers the record as if he's getting information, but he renders his opinion anyway, should we take a look at that and say, well, this isn't really peer review. This is a guy who's just trying to make it look good, but he's just doing what he's doing to get to a predetermined result? Well, Your Honor, he did reach out and left messages. And so, when you look at his report itself, it takes into consideration the entire medical record, acknowledges the conflicting prognosis notes amongst the treating physicians regarding the appellant's lifting abilities and restrictions, and then he reaches his decision and recommendation for the claims administrator. My colleagues will indulge me. I want to ask you the question that I asked Mr. Glass. Assume for the sake of discussion we thought, you know what, there's enough problems here that this has to be, you know, that the decision is unsupportable based on what the decision itself expresses. And so, we're sending it back to the district court. What would the order look like that the district court would get? Would we be directing the district court to tell the administrator, you've got to reinstate benefits, give them back benefits, and then you can go ahead and reevaluate. As your colleague says, Miller demands. Or is there some other order that, consistent with our law, we would enter? What's your take on that? I mean, I know you don't want to go there, but go there on the assumption I've given you. You're not giving anything away. Yeah. Your Honor, my understanding is that benefits, if it's determined that the claims benefit is determination, it's decided that it's arbitrary and capricious, you know, and that there was an abuse of discretion here, then my understanding is that there would be an order for benefits to be reinstated. Including back benefits. And that I'm actually not as clear on, Your Honor, as to whether there would be back benefits for. I'll ask both sides to give us a letter memorandum. And that, Your Honor, we would appreciate. It should be very simple. 28-J letters, like three pages or less, just like give us the law on that, okay? Thank you, Your Honor. Okay. Okay, thank you very much, Mr. Lewis. Appreciate it. Mr. Glass, we'll have you back on rebuttal. I'll make one amendment. I just heard what you said about the letter, but one amendment to the order going back is, calculate the Social Security offset, because I think that's clear. Well, you frame what you think the law is, and they'll frame what they think the law is, because if we, you know, we may or may not get to the point of agreeing with you, but if we did get to the point of where we were agreeing with you, it would be nice to know what both sides' positions were about what the framing of an order ought to look like. Yes, sir. Yes, sir. So for 28 years, this guy was hi-ho, hi-ho, it's off to work I go, first in the rock quarries of Virginia and then in the coal mines of Virginia. If you looked at a medical manual of musculo-orthopedic injuries, he's got one of everything. Okay. Here's what it would be most helpful for, at least me, for you to address. You don't have to persuade us that the man's got limitations. They admit he's got limitations. The question we're wrestling with is, is there enough in this record to support, by substantial evidence, the decision they made as they expressed it? Okay. Now, speak to that. Their argument is, in essence, that the district court judge got it right. Yeah, they made a mistake in the way they identified his previous employment title, but everything else was good. It's all good. Like, go with that argument. Yes, sir. Everything else is not good. Because what this Court has said is we look at the procedural irregularities in the case. Starting with, let me do it this way. If these reports and this decision were in the first six months or eight months when he transferred to his anti-occupation period, this is a lot closer case. The biggest thing, and, again, I started with this argument, is for three years they found that the evidence, the actual medical records, supported the claim. And all I'm saying is the unbiased, curious fiduciary must say to the doctors who are looking at paper records and making fine distinctions about whether someone can lift 5 pounds, 10 pounds, sit for 20 minutes or not, say, look, here's our baseline. We have already determined that his records entitle him to benefits, and we've made that decision for three years. And that's what Miller says, and I think the case is either Noga or Noda. I apologize, but it's in our brief. And start the analysis there. What in the medical records has changed? And the only one who really addressed this is Dr. Patel because Dr. Cohen, yeah, I mean, you read his report. He's like, he limits his opinion to the three months from March of 2020 until the time he wrote his report. So he does no analysis of, oh, gee, you paid for three years. What's changed? And he's telling you, he's telling us, everybody, only his opinion on the three months since March of 2020. So your time's up. I'll give you just a moment to wrap up. Look, look, look, I'm good. I appreciate the time. It's the first time I've been here. I'd ask that you find that the decision was arbitrary, and I'll give you my version of what the order should look like. Could you get those 20HA letters to us? Is a week enough time for you to do that, take a look? You need, like, 10 days. We'll say 10 days? Yes. Okay. And to be very clear, it's on what the, if you agree with me. If we were to determine in your favor with respect to the argument that this was an abuse of discretion. Yes, sir. What is the, what does our law call for in the way of remedy? Yes, sir. Okay. Thank you very much. Okay. Thank you, counsel. Appreciate argument. And we'll go ahead and call our.